UNITED STATED DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**UNITED STATES OF AMERICA,**

        Plaintiff,                     Case No.: 8:13-cr-00252-RAL-TBM

v.

**JOHN ANDREW WELDEN,**

        Defendant.

_____/

## DEFENDANT'S MOTION FOR RELEASE PENDING TRIAL

COMES NOW, the Defendant, John Andrew Welden,[1] by and through his undersigned counsel, and files this Motion for Release Pending Trial and, in support thereof, would show as follows:

1.      On May 15, 2013, the Defendant, was arrested pursuant to a two-count Indictment for one count of causing serious bodily injury to an individual by tampering with a consumer product in violation of 18 U.S.C. § 1365, and for one count of causing the death of an unborn child in violation 18 U.S.C. §§ 1841 and 1111(a).

2.      Mr. Welden made his initial appearance before United States Magistrate Judge Anthony Porcelli on May 15, 2013, who considered the issue of bond at that time. (Doc. 6.)

3.      Notwithstanding Mr. Welden's lack of criminal history, close community ties, and substantial family support, the government requested the Defendant be detained as a danger to

---

[1] Mr. Welden is commonly referred to by his middle name (Andrew), as demonstrated in the affidavits submitted in support of his pretrial release. Redacted versions of theses affidavits are filed hereto as exhibits 1-16 to this Motion; however, unredacted versions of these documents were previously provided to the government.

the community and risk of flight, pursuant to 18 U.S.C. § 3142(f)(1)(1)(A)&(B), based on the offenses charged and the Guidelines sentence for Count Two. (Doc. 8, P. 1.)

4.      During the initial hearing, counsel for the Defendant argued that Mr. Welden did not pose a flight risk and did not attempt to flee even though he had been aware of this investigation. In addition, Mr. Welden's father and stepmother appeared before the Court, and stood willing to co-sign a secured bond and post property to ensure the Defendant's future appearances in court through trial. (*Id.*) Further, counsel for the Defendant informed the Court that Mr. Welden was amenable to a curfew and electronic monitoring. (*Id.*)

5.      Upon hearing argument of counsel, Judge Porcelli agreed with the government's position and ordered the Defendant be detained pending trial. (*Id.*)

6.      Undersigned counsel respectfully submits that the circumstances have changed since the Magistrate Judge ordered the Defendant be detained such that Mr. Welden should be admitted to conditions of release pending trial. Material information that was not previously presented to this Court during the brief initial bond hearing supports and compels Mr. Welden's pretrial release.[2]

7.      The Defendant requests that the Court grant him release pending trial, with any number and combination of special conditions the Court deems necessary, including the posting of a secured bond, home detention, electronic monitoring, daily telephonic communication with Pretrial Services, surrender of the his passport, and/or his residing with his father and stepmother as third party custodians. In addition, and in a tremendous outpouring of support, Mr. Welden's family and friends, from the Tampa Bay community and throughout the nation, have agreed to

---

[2] Even after a judge has made a determination on the issue of bond, as is the case here, a detention hearing may be reopened to allow for the presentation of information that was not known to the defendant at the time of the initial bond hearing that is relevant on the issue of whether there are conditions of release that will reasonably assure the appearance of the defendant and safety of the community. 18 U.S.C. § 3142(f)(2).

co-sign a cash bond, sign personal guarantees, post real and personal property as collateral, and take all necessary steps to assure this Court of the Defendant's appearance for all future court dates.

8.      Undersigned counsel has conferred with AUSA Steve Muldrow, who opposes this Motion.

9.      The undersigned respectfully requests the Court set an expedited hearing on this matter.


## MEMORANDUM OF LAW

### I.    APPLICABLE LEGAL STANDARD

Pursuant to the Bail Reform Act of 1984, a court is required to order the pretrial release of a defendant on his own personal recognizance, or upon the execution of an unsecured appearance bond unless the court "determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). In passing the Bail Reform Act, Congress intended for courts to require pretrial release on reasonable conditions for almost every person, with detention reserved only for a small and exceptional subset of defendants:

> There is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial.

S.Rep. No. 225, 98th Cong., 1st Sess. 6-7, *reprinted in* 1984 Code Cong. & Admin. News 3182 at 3188-89; *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) ("[O]nly a 'limited group of offenders...should be denied bail pending trial.") (internal quotations omitted).[3]

The statutory language governing the likelihood of appearance requires the setting of conditions, or a combination thereof, which will "reasonably assure" the appearance of a defendant, recognizing that a requirement that there be a "zero risk" of nonappearance is contrary to the intent of the law, and would compel detention of all individuals who stand accused of crimes. *United States v. Madoff*, 586 F.Supp. 2d 240, 249 (S.D.N.Y. 2009). The intent of the Bail Reform Act is that the least restrictive combination of conditions be imposed. *United States v. Giordano*, 370 F.Supp. 2d 1256, 1259 (S.D. Fla. 2005). Thus, a defendant is to be released on bail on the least restrictive condition or combination of conditions that will reasonably ensure his appearance when required and the safety of the community. 18 U.S.C. § 3142(c)(1)(B) (a court must release a defendant on bail on the least restrictive condition or combination of conditions that will reasonably assure defendant's appearance when required and the safety of the community).

Consequently, the issue at this point of Mr. Welden's case is not the offenses for which he is charged, nor whether the Defendant's actions should result in his widespread disapprobation by the public and media, nor even what would be the appropriate punishment should he be convicted. Rather, the legal issue before this Court is whether the government has carried its

---

[3] The Eleventh Circuit found the defendant in *United States v. Quartermaine*, 913 F.2d 910 (11th Cir. 1990), to be prime example of a "particularly dangerous defendant," consistent with those individuals Congress intended be detained without bail. Quartermaine was indicted for narcotics offenses, was freebasing crack cocaine when arrested, had loaded firearms in his possession, resisted arrest, had a prior history of failures to appear, had extensive contacts in Colombia and Panama, claimed Honduras to be his "true home," had $374,000 on deposit in a Cayman Islands bank account, had a "cultivated reputation for violence," and made multiple threats to witnesses who feared to testify against him. *See generally Quartermaine*, 913 F.2d 910 (ordering defendant be detaining pending trial).

burden of demonstrating that no conditions or combination of conditions can be set that will reasonable assure Mr. Welden's appearance and protect the community from danger. 18 U.S.C. § 3142(e).

Pursuant to 18 U.S.C. § 3142(b), a court must order a defendant be released on personal recognizance or upon the execution of an unsecured appearance bond, "unless the court determines that such a reasonable bond will not reasonably assure the appearance of the person as required or will endanger the safety of the community." Under subsection (f)(1) of the Bail Reform Act, the government may seek detention where a defendant, such as Mr. Welden, has been charged in a case involving certain offenses, including, *inter alia*,[4] a crime of violence carrying a maximum term of ten years or more, or an offense that carries a maximum sentence of life imprisonment or death. 18 U.S.C. § 3142(f)(1). The government may also seek detention under § 3142(f)(2) in a case involving a serious risk that the defendant will flee, or a serious risk that a defendant will obstruct or attempt to obstruct justice. 18 U.S.C. § 3142(f)(2).

As stated, in the event the Court finds the imposition of conditions of release necessary and appropriate, it is to order the *least restrictive* conditions, or combination thereof, to ensure the Defendant's appearance and safety of others and the community. 18 U.S.C. § 3142(b)-(c); 18 U.S.C. § (c)(1)(B)(i)-(xiv) (providing a non-exhaustive list of conditions that the court may impose in its order for release upon conditions). When determining whether to grant a motion for release pending trial, a district court must consider the factors enumerated in 18 U.S.C. § 3142(g). The applicable factors include:

> **(1)** the nature and circumstances of the offense charged, including whether the offense is a crime of violence...;

---

[4] The government may also seek detention where a defendant is charged with serious drug offenses, felonies committed by certain repeat offenders, and felonies that are not otherwise crimes of violence involving a minor victim or the possession or use of a firearm, destructive devise, or dangerous weapon. 18 U.S.C. § 3142(f)(1).

**(2)** the weight of the evidence against the person;

**(3)** the history and characteristics of the person, including—

  **(A)** the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

  **(B)** whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

**(4)** the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Although the Defendant is charged with a crime of violence, and he is facing a lengthy term of imprisonment in relation to Count Two, we submit that the factors delineated above weigh heavily in favor of Mr. Welden's release.[5] Reasonable conditions can and should be imposed to assure his appearance at trial and at any hearings held during the pendency of his case.

---

[5] It appears that during the Defendant's initial appearance, the government argued that the rebuttable presumption contained in 3142(e)(3) applies  to Mr. Welden's case based on the potential for a sentence of life imprisonment under Count Two. *See* Tr. of Initial Appearance and Bond Hrg. on May 15, 2013, P. 13 (There is a "rebuttal for presumption [that the Defendant is] both a danger to the community and a risk of flight apply...based on the life sentence."). However, application of that presumption is erroneous in this case because the charged offenses do not meet any of the criteria contained in 18 U.S.C. § 3142(e)(2)-(3).

## II.   MR. WELDEN DOES NOT POST A RISK OF FLIGHT, NOR IS HE A DANGER TO THE COMMUNITY

### 1)   Nature and Circumstances of Offense Charged

As observed by the Court at the initial hearing, the nature and circumstances of the offenses charged here are very serious. Notwithstanding, the undersigned respectfully submit the other factors set forth in § 3142(g), including Mr. Welden's character, familial support, and devotion and ties to his community, demonstrate that conditions of release can be imposed to assure his appearance in Court. In addition, there is no allegation, and no evidence to support, that the Defendant committed the charged offenses while in possession of a firearm or during the commission of a felony. Moreover, it is respectfully submitted that there is no evidence that suggests the Defendant poses a danger to others, or that he constitutes a flight risk.

### 2)   The Weight of the Evidence

Based on a review of the Order of Detention Pending Trial, it is apparent that the Magistrate Judge relied upon a "proffer outlining the strength of the evidence against the Defendant," including "recorded post-*Miranda* statements made by the Defendant admitting to the alleged conduct." (Doc. 8, P. 1.) However, the government's proof against Mr. Welden can hardly be regarded as open and shut at this point in the proceedings. Mr. Welden, a presumptively innocent man and with no notable prior criminal record, has a prospect of acquittal. Indeed, § 3142(j), specifically provides that "[n]othing in [the Bail Reform Act] shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j).

The factual allegations of the government's case are contingent upon several aspects, including the accusations of its main accusing witness, "R.L.," the Defendant's statements, and the applicability of the charged statutes to the facts of this case. Each of these aspects have factual and legal failings that the defense will bring to light in its pretrial motion practice.

As an initial matter, the government contends that the Defendant admitted to the alleged conduct in a post-*Miranda* statement. (Doc. 8, P. 1.) However, the transcript of this statement, which was provided to undersigned counsel pursuant to the government's discovery obligations, contains no mention of *Miranda* warnings. In addition, Mr. Welden made these statements while he was sitting in a police car, in close proximity to two armed Hillsborough County detectives, and after having a prior conversation with the interviewing detectives that was not recorded.[6] The defense is evaluating a motion to suppress these statements.

Moreover, and perhaps most significant, are the statutory provisions under which Mr. Welden is charged. Again, as will be discussed more during the pendency of this case, the government's application of the facts of this case to the statutory provisions identified is both unique and unprecedented. This appears to be a case of first impression, presenting novel legal issues. Indeed, defense counsel have located only two other cases in the United States where defendants were charged under the statute identified in Count Two, both of which are readily distinguishable from the facts present in this case. While the undersigned have not yet received all discovery, defense counsel anticipates extensive pretrial motions in this case involving complex legal, factual, and constitutional issues.

In particular, Count Two (murder) is dependent on Count One (tampering). The government alleges in Count One that the Defendant placed R.L. in danger of death or bodily injury; however, the limited discovery received to date does not support that finding. Although the government contends R.L. suffered great bodily harm, and with all due respect to what R.L. has experienced, the government's theory of harm is both unprecedented and apparently unsupported by the facts.

---

[6] This case was investigated by the Hillsborough County Sheriff's Office and referred for federal prosecution, apparently because it was determined there was no state crime associated with the conduct alleged in Counts One and Two.

The government contends that R.L. took Cytotec, a brand name version of Misoprostol, midday on Friday, March 29, 2013. Two days later, on Sunday, March 31, 2013, R.L. sought medical attention at Tampa General Hospital (TGH). R.L. states, in a controlled call placed by R.L. with the assistance of Hillsborough County detectives, that there was no fetal heartbeat at the time R.L. was seen and treated by medical personnel at the hospital. *See* Tr. of Controlled Call Mar. 31, 2013, P. 9 ("The baby is dead, Andrew. It's dead. It doesn't have a heartbeat."). The allegation that Cytotec caused the lack of fetal heartbeat conflicts with documents provided by the government that plainly state that Misoprostol is nontoxic to fetuses. *See* Greenstone, Misoprostol Tablets (Warnings and Description) ("Misoprostol is not fetotoxic... ."). Thus, according to some of the government's own evidence, the medication allegedly provided to R.L. by the Defendant did not cause the heartbeat to stop.

Furthermore, clinical studies show that approximately 25% of all pregnancies, even those involving healthy women, end in miscarriage, and most miscarriages occur within the first eight to twelve weeks of pregnancy.[7] R.L. received her first and only ultrasound on Thursday, March 28, 2013. At that time, R.L. expressed that she was experiencing bleeding and cramping,[8] and that she thought she may be having a miscarriage or that there may be some other complications

---

[7] Miscarriage is the most common type of pregnancy loss...Most miscarriages occur during the first 13 weeks of pregnancy." American Pregnancy Association, Miscarriage (Nov. 2011), http://americanpregnancy.org/ pregnancycomplications/miscarriage.html (hereinafter "APA, Miscarriage"); North Jersey Fertility, Habitual Abortion, http://www.northjerseyfertility.com/ habitual.html (last visited June 4, 2013) ("Most recognized pregnancy losses occur before 8 week gestation."). Even for healthy women, the chances of having a miscarriage range from 15-20%, and the risk increases for women who have had a previous miscarriage. March of Dimes, Pregnancy Loss (Oct. 2008), http://www.marchofdimes.com/loss/ miscarriage.aspx (noting that "[a]s many as 40 percent of all pregnancies may end in miscarriage.").

[8] Warning signs of a threatened miscarriage include abdominal cramps with or without vaginal bleeding, and vaginal bleeding during the first twenty weeks of pregnancy. New York Times, Health Guide, Miscarriage-Threatened, http://health.nytimes.com/health/guides/disease/abortion-threatened/ overview.html (last visited June 4, 2013) (hereinafter "NYT Health Guide"; *see also* Anai Rhoads, Pregnany.org, Miscarriage Facts, http://www.pregnancy.org/article/miscarriage-facts (last visited June 4, 2013) ("Any bleeding from the vagina during pregnancy suggests the possibility of miscarriage.")

with the pregnancy. Although the ultrasound taken that day revealed a viable embryo, approximately a quarter of an inch in size, and approximately six weeks past the point of conception, the examining physician[9] noted a "threatened abortion,"[10] thereby indicating a miscarriage was possible based on the symptoms present at the time of R.L.'s examination.

Based on these facts, the undersigned submit there is substantial evidence to support that R.L. was experiencing the onset of a miscarriage prior to the point the government alleges the Defendant provided to the pill to R.L. and that there is a significant likelihood that R.L. suffered a miscarriage as a result of factors entirely unrelated to any conduct on the part of the Defendant.[11] A potential miscarriage is further substantiated by the medical literature stating Cytotec is nontoxic to fetuses, as discussed *supra*.

The proffer previously made by the government, based upon the information known at that time, fails to take into account pertinent legal and factual defenses that will likely arise after a thorough and comprehensive review of discovery and applicable case law, as well as defense counsel's independent investigation into the government's allegations.

### 3)  Mr. Welden's Impeccable History and Characteristics

a.  Character, Employment, and Education

Mr. Welden has an exceptional record for non-violence, peacefulness, respect, honesty, and good character. *See generally* Ex. 1-16, Aff. of Supporters (describing Mr. Welden as a kind,

---

[9] These progress notes were among the discovery materials provided by the government in this case.
[10] A "threatened miscarriage" is characterized as "[s]ome degree of early pregnancy uterine bleeding accompanied by cramping or lower backache. The cervix remains closed. This bleeding is often the result of implantation." APA, Miscarriage. A threatened miscarriage or threatened abortion suggests a miscarriage might take place before the twentieth week of pregnancy. NYT Health Guide.
[11] According to the American pregnancy Association, there are a wide variety of reasons for miscarriage. *See generally* APA, Miscarriage. The most common cause during the first trimester (the first twelve weeks), is chromosomal abnormality, which results from a damaged egg or sperm. *Id.* Other causes include hormonal problems, infections of maternal health problems, lifestyle (e.g. smoking, drug use, toxic substances, excessive caffeine), or improper implantation of the egg into the uterine lining. *Id.*

compassionate, patient individual with absolutely no history of violence). He is currently enrolled at the University of South Florida and, at the time of his arrest and detention, was one year away from earning dual Bachelor's Degrees, (a Bachelor of Arts and a Bachelor of Science), in Biomedical Studies and Religious Studies. Mr. Welden had a 3.6 GPA at USF, where he was an active member of a premedical student association, leadership society, and honors society. In addition to his coursework and extracurricular activities, Mr. Welden volunteered as a tutor to a student preparing for his General Education Development (GED) Test, as well as a young student enrolled in biology, chemistry, and mathematics courses.

Prior to attending USF, Mr. Welden attended the University of Mississippi (Ole Miss) on a track scholarship, which he was awarded due to his athletic and academic accomplishments during high school. Although Mr. Welden lived in Tampa at the time of his arrest, where he was born and raised, he lived in Memphis, Tennessee for a period of time following his parents' divorce. Mr. Welden graduated from Christian Brothers High School in Memphis, an all boys Catholic school, where he excelled in track and field, specifically the high jump, long jump, and triple jump events. In addition to his athletic achievements, Mr. Welden played a lead role in a major theatrical production during high school, and his academic success is evinced by his achieving honor roll.

After graduating from high school and completing his first year of college at Ole Miss, Mr. Welden was accepted to USF and he moved back to Tampa to continue his undergraduate studies at the University. While attending USF, Mr. Welden worked full time, first in retail and later at a warehouse for a local granite importer. Although Mr. Welden began as an associate, he was quickly promoted to warehouse manager of the importation company. Upon the closure of the warehouse in late 2009, Mr. Welden took a position working as the Office Manager for

Premiere Weight Loss Clinic, where he has maintained steady employment for the last four years. At the time of his arrest, Mr. Welden was preparing to take the Medical College Admission Test (MCAT).

Mr. Welden is a religious young man who takes significant strength from his faith in God. He is very close to his immediate and extended family. Mr. Welden has three brothers and sisters and three step-siblings, all of whom he maintains a close relationship with and communicates with on a regular basis. Mr. Welden is known for being honest, trustworthy, dependable, and peaceful, despite the allegations brought by the government in this case. *See* Ex. 1-16, Aff. in Support.

### b. Family

Mr. Welden has an extensive family, including his mother, grandmother, father, stepmother, and six siblings. *See* Tr. of Initial Appearance and Bond Hrg. on May 15, 2013 (hereinafter "Tr. of Initial Hrg."), P. 13 ("The United States has no dispute that the defendant...has long-standing ties to the community [and a] supportive family."). Each and every member of Mr. Welden's family supports his release pending trial, as demonstrated by their pledges of significant monetary funds and assets. These pledges demonstrate the consensus among Mr. Welden's family, friends, and colleagues that the Defendant will comply with any and all mandates issued by this Court, including appearing as required.

### c. Employment

As discussed in section II(3)(a), *supra*, Mr. Welden has demonstrated an impressive work ethic, as demonstrated by his consistent and steady employment. The Defendant began working when he commenced high school in Memphis. At that time, he worked for a plumbing company digging ditches and soldering copper. Toward the end of his freshman year of high school, he

worked weekends at a local sandwich shop where his brother was a manager at the time. Mr. Welden continued his work in the restaurant industry throughout high school, including working the evening shift as a dishwasher at an Italian restaurant during the summers of his sophomore and junior years. Then, in early 2003, prior to leaving for Ole Miss, Mr. Welden worked for an alarm company.

Upon moving to Tampa, Mr. Welden undertook employment at a retail store in Tampa, where he met his girlfriend of six years, until he took a position with the flooring store and granite importer as a warehouse worker, and later as a warehouse manager. For the past four years, Mr. Welden has worked for Premiere Weight Loss Clinic, located in Tampa, where he was responsible for assisting patients, helping with orders and supplies, faxing documents, dealing with insurance, and other daily, administrative tasks. Premiere continues to support Mr. Welden as they believe in his character.[12]

### d.  Financial Resources

Mr. Welden's family, friends, and colleagues stand willing to sign personal guarantees and pledge personal and real property totaling a combined estimated value of $1,117,000 to secure his release on bond pending trial.[13] Each and every pledge represents a significant commitment by these individuals and is a reflection of their belief in Mr. Welden's outstanding character, innocence, and respect for the law and criminal justice system. Though these pledges are within the means of each pledge maker, the resulting financial difficulty that would ensue if the government confiscated the pledgors' assets would be significant. In some instances, Mr.

---

[12] *See* Ex. 1, Aff. of Deborah Barnley (Mr. Welden "has always been personable, professional, and caring to patients dealing with delicate matters involving weight loss"); Ex. 2, Aff. of Dr. Mardelle Delight (Mr. Welden was attentive to the needs of clinic patients).

[13] This number constitutes the estimated combined value of the money, personal property, and real property owned by the numerous pledgors, as represented in exhibits 1-16, as well as the real property owned by Mr. Welden's father and stepmother. This total does not include any liquid funds on the part of Mr. Welden's father or stepmother.

Welden's family and friends are willing to pledge their home or sole vehicle, acts which truly demonstrate their belief that Mr. Welden is by no means a flight risk, and it a truly honorable person.[14]

#### e.   Residence in the Community and Community Ties

As noted by the government, in addition to a supportive family, Mr. Welden "has long-standing ties to the community." *See* Tr. of Initial Hrg., P. 13. Mr. Welden is a citizen of the United States, having been born and raised in Tampa. Mr. Welden's father and stepmother live in Tampa, as do several of his brothers and sisters, as well as his nephew. Until his incarceration, Mr. Welden was extremely involved in his siblings' lives, including helping them with school and supporting them in whatever way he could. *See, e.g.*, Ex. 7, Aff. of Hope Welden (describing Mr. Welden as her "hero," and noting she has always looked up to him). Indeed, at the time of his arrest, the Defendant lived with his younger brother, Robert, Robert's girlfriend, and their son (Mr. Welden's nephew). Mr. Welden played a significant role in his nephew's life, and provided substantial support to his younger brother and the child's mother. *See* Ex. 8, Aff. of Robert Welden (describing the support Mr. Welden provides in the care of Robert Welden's son). In addition, Mr. Welden participated whenever he could with religious and community events, including volunteering at a local hospital and tutoring individuals in various subjects. *See* Ex. 9, Aff. of Thomas Griffin (Mr. Welden "has performed hundreds of volunteer hours at Tampa General Hospital"). He is a true academic who enjoys learning, and assisting others in doing the same. *See* Ex. 10, Aff. of Tara Fillinger ("Andrew has always enjoyed learning.").

---

[14] *See, e.g.*, Ex. 3, Aff. of Kim Armstrong (willing to pledge her car); Ex. 1, Aff. of Barnley (willing to pledge her home and three vehicles); Ex. 4, Aff. of John Manna (willing to pledge his only vehicle); Ex. 5, Aff. of Justin Sypult (willing to pledge half of his savings); Ex. 6, Aff. of Alisha Vasquez (willing to pledge the only vehicle she owns); Ex. 7, Aff. of Hope Welden (willing to pledge car and cash); Ex. 8, Aff. of Robert Welden (willing to pledge his only vehicle and the entire contents of his college fund).

Mr. Welden also has close family located in Memphis, Tennessee, where his mother was born and raised. *See, e.g.*, Ex. 5, Aff. of Justin Sypult (high school friend). His mother is originally from Memphis, and most of her close family members remain in the area. Following his parents' divorce, Mr. Welden moved back to Memphis to be close to his mother as she recovered from the divorce, and to develop a closer relationship with her. He moved to Memphis just prior to commencing high school, and graduated from Christian Brothers High School.

As demonstrated by the attached affidavits, Mr. Welden has established deep ties in this community, and maintains a close relationship with his family and friends in Memphis. The Defendant can provide to the Court and Pretrial Services the names and locations of all family members in Tampa and Tennessee as part of his conditions of release.

### f.   Past Conduct

Mr. Welden's history is extraordinary. He has been an upstanding citizen and a role model for not only his family and Tampa Bay community, but also in his former communities of Memphis, Tennessee and northern Mississippi.

### g.   Criminal History

Mr. Welden has no relevant, significant criminal history. His only prior charge is a misdemeanor, which stems from an arrest approximately a decade ago for possession of drug paraphernalia while Mr. Welden was attending Ole Miss. In that case, Mr. Welden complied with all requirements set forth by the court.

### h.   Behavior While Incarcerated

Mr. Welden has been incarcerated at the Pinellas County Jail since he was remanded into the custody of the U.S. Marshal Service following his initial detention hearing on May 15, 2013. During this period of detainment, Mr. Welden has been a model inmate. Consistent with his

history of tutoring his family and others in his community, Mr. Welden has taken it upon himself to assist his fellow inmates in preparing for the GED, and he's undertaken an active role in a prayer group that meets each and every night.

      i.   Other Pending Offenses at the Time of Offense or Arrest

At no other time in his life has Mr. Welden had any offense pending under federal, state, or local law for which he might have been on probation, parole, or release pending trial.

### 4) Mr. Welden Does Not Post a Potential Danger to Any Other Person or the Community

The allegations in this case that Mr. Welden acted in a violent manner stand in complete isolation and stark contrast to the overwhelming evidence that Mr. Welden is a non-violent, model citizen. As is supported by the affidavits of his family and friends, Mr. Welden is reasonable, patient, and compassionate. As discussed in sections II(3), *supra*, Mr. Welden is a devoted member of the community and a beloved member of his family. He is known for his charitable acts, including hundreds of hours of community service, as well as his good nature, patience, and temperament. He is not a danger to anyone in his community. Indeed, Mr. Welden is an incredible asset whose absence is greatly felt. The criminal actions for which the government alleges the Defendant is responsible center on one individual, R.L.,[15] and her unborn. The undersigned in no way wishes to undervalue or mischaracterize the charged offenses, but it is significant to note that the Indictment makes no mention of the Defendant's attempt to harm others, nor is there any evidence that the Defendant represents a danger to the community. Rather, the focus of the alleged conduct is limited in scope, unlike in other cases where courts in the Eleventh Circuit have found detention appropriate in light of the risk of danger an accused posed to the greater public. *See, e.g.*, *United States v. Megahed*, 519 F. Supp.

---

[15] Certainly, the Court could order and enforce that the Defendant have no contact with R.L. as a condition of release.  There is nothing to suggest that condition would not be followed.

2d 1236, 1244 (M.D. Fla. 2007) (finding defendant, a foreign citizen with minimal, attenuated ties to the country accused of interstate transport of explosives, a risk of danger to the community).

### 5) Mr. Welden is Not a Flight Risk

Mr. Welden is a 28-year-old college student who owns no real property and has no notable funds. Moreover, he has no international connections;[16] indeed, the last time he traveled overseas was on a family cruise approximately five years ago. Moreover, Mr. Welden has been aware of the investigation of this case since March 2013, nearly two months prior to his arrest in relation to the instant case, when he was approached and interviewed by state law enforcement officials. Despite his knowledge of the pending investigation and likelihood of criminal charges, Mr. Welden did not flee the district or attempt to hide. As a matter of fact, Mr. Welden appeared in Hillsborough County court in response to a domestic violence petition filed by R.L., at which time a judge determined that a domestic violence injunction should not be imposed as Mr. Welden did not constitute a risk of harm to R.L. or others.

In this case, the government contends that the Defendant poses a risk of flight based on the charged offenses and potential prison sentence in relation to Count Two. In other cases concerning risk of flight, courts nationwide have required "more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight." *United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) (finding pretrial detention of defendant erroneous where based on the nature of the charges, the strength of the government's case, the potential for a long sentence of incarceration, defendant's age, and the

---

[16] The Defendant is amenable to surrendering his passport.

obloquy defendant faced in community).[17] The "theoretical risk of flight" is simply never sufficient to justify detention. *Giordano*, 370 F. Supp. 2d at1264.

In *Giordano*, the court identified several factors typically considered relevant in assessing risk of flight; including the use of a number of aliases, unstable residential ties to the community, efforts to avoid arrest, hidden assets, or a state intention to flee. *Id.* The government provided no proof as to the presence of any of these factors, and there is none. Because the government's evidence is insufficient to justify denial of conditions of release, Mr. Welden should be granted release pending trial.

In *Madoff*, 586 F.Supp. 2d 240, like here, the government argued that Madoff should be detained because he posed a serious risk of flight. 586 F.Supp. 2d 240, 248. To support its contention, the government relied upon the scope and nature of the alleged crime, which the district court noted as "perhaps the largest Ponzi scheme ever," as well as the likelihood that Madoff would face a sentence at the top of the applicable Sentencing Guidelines range. *Id.* In addition, the government argued that Madoff's assets could not be effectively restrained, his ties to his community had been substantially severed to the extent only his wife and brother were willing to sign his bond, and Madoff was involved in the distribution of personal property to third parties. *Id.* Despite its recognition that the charges in Madoff's case were indeed of an "unprecedented nature," the court rejected the government's contention that no condition or combination of conditions could address the risk that Madoff would flee pending trial, noting that the conditions of release previously imposed by the court-including home detention,

---

[17] *See, e.g.*, *United States v. Jackson*, 823 F.2d4, 6-7 (2d Cir. 1987) (detention appropriate for defendant arrested on narcotics charge that gave rise to a presumption of flight under 18 U.S.C. § 3142(e), where defendant had used a number of aliases, lived from hotel to hotel, shown skill in avoiding surveillance, and had hidden assets); *United States v. Coonan*, 826 F.2d 1180, 1186 (2d Cir.1987) (detention warranted where defendant had been a fugitive for nearly four months on the charges for which he was incarcerated and his fugitive status ended by capture); *Shakur,* 817 F.2d at 191 (defendant on FBI's list of "Ten Most Wanted Fugitives").

electronic monitoring, and the subsequent order of a guard-were "reasonably calculated to assure Madoff's appearance when required." *Id.* at 248-49.

In *Giordano*, 370 F. Supp. 2d 1256, the court considered the case of Defendant Giordano, who, like Mr. Welden, was a United States citizen with no prior criminal history, no history of flight or known intentions to flee, and substantial family ties in the United States. 370 F.Supp. 2d at 1257. However, distinct from Mr. Welden were Giordano's alleged crimes, which consisted of thirty-five counts of conspiracy, mail fraud, wire fraud, and money laundering. *Id.* Consistent with the charges, the government argued that Giordano had significant funds available to finance flight. *Id.* at 1258. The court denied the government's motion to detain the defendant pretrial, finding that the government's case for detention was based upon a "perceived danger rather than a real serious risk of flight." *Id.* Although the court recognized the serious nature of the government's allegations, as well as the government's evidence showing a pattern of fraudulent conduct on the part of the defendant, the court determined Giordano did not pose a serious risk of flight, and granted him release upon conditions, including a substantial monetary bond, home detention, and electronic monitoring. *Id.*

In *United States v. Khashoggi*, 717 F. Supp. 1048, 1052 (S.D.N.Y. 1989), the court considered release pending trial in the case of "an enormously wealthy and well-known Saudi Arabian businessman" charged with nine co-defendants with violations of the Racketeer Influenced Corrupt Organization Act ("RICO"), RICO conspiracy, obstruction of justice, and mail fraud. 717 F. Supp. 1048, 1048. Upon indictment, the defendant was outside the court's jurisdiction and living abroad, and had not even visited the United States in the three years prior to the indictment. *Id.* at 1049. Rather than voluntarily surrender to the court's jurisdiction, the defendant remained abroad as a fugitive, and was ultimately extradited to the United Sates on the

19

mail fraud and obstruction charges. *Id.* Upon the defendant's return to the United States, the government moved pursuant to 18 U.S.C. § 3142 for the defendant's pretrial detention on the ground that the defendant possessed a vast amount of resources that rendered release upon any set of conditions impossible to insure the defendant's presence at trial. *Id.*

Despite the defendant's vast financial resources and fugitive status, the court determined the defendant did not constitute a flight risk, and granted him release upon conditions. *Id.* at 1051-52 (granting defendant release upon conditions, including a personal recognizance bond and a co-signed secured bond, electronic monitoring, in-person reporting to pretrial services, daily telephonic communication with pretrial services, surrender of passport and prohibition on travel, and confinement to the district). Taking into account the factors in § 3142(g), the district court reasoned that the defendant's reputation was substantially ruined, and that the defendant would be subject to prosecution upon recapture for jumping bail. *Id.* at 1051. Moreover, the court noted the defendant could be tried *in absentia* if he were to flee, and that his decision to waive his rights abroad and travel to the United States for arraignment manifested his intent to remain in the country and face the charges against him. *Id.* at 1052.

Unlike the defendant in *Khashoggi*, Mr. Welden is far from "enormously wealthy," nor does he have any ties to foreign countries or history of relevant foreign travel. To the contrary, Mr. Welden's only notable asset is a 2007 Pontiac. He owns no real property.[18] In addition, Mr.

---

[18] As part of its argument for detention, the government raised the issue of property owned by Mr. Welden's father. Tr. of Initial Hrg., P. 17. During this portion of the hearing, the government suggested that Mr. Welden's family would utilize its wealth, including real estate held in the name of his father and stepmother, to aid the Defendant in fleeing. *Id.* However, as recognized by the government, Mr. Welden's father and stepmother, and not Mr. Welden, are the owners of the real estate identified by the government. Moreover, as discussed herein, and as represented by defense counsel at the Defendant's Initial Hearing (Tr. of Initial Hrg., P. 14), Mr. Welden's family is willing to sign a property bond in relation to this real estate, which have an estimated combined equity in excess of $700,000, and the addresses of each and every property can be provided to Pretrial Services or the Court. Further, the government's assertion that the socioeconomic status of the Defendant's family renders the Defendant a flight risk is unwarranted and

Welden has no significant financial assets. He is willing to surrender his passport, submit to home detention and electronic monitoring, commit to daily telephonic communication with pretrial services, and live with his father and stepmother as third party custodians as part of his bail package. Moreover, Mr. Welden is amenable to signing a secured bond, as are his family and friends, to assure his appearance.

### CONCLUSION

It is imperative that the Court balance the rights of the accused, including the presumption of innocence, with the need to protect the community and assure court appearance for the Defendant. *See* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.) For this reason, undersigned counsel request the Court look beyond the offenses for which Mr. Welden is charged and devise conditions of release that will ensure community safety and the Defendant's appearance in court. Defense counsel recognizes that no precautions, including pretrial detention, ever conclusively guarantee a defendant's presence at trial.[19] However, the Bail Reform Act does not require the risk of flight be zero; rather, the conditions imposed on the Defendant need only "reasonably assure" Mr. Welden's appearance. The undersigned respectfully submit that the conditions of release, including a substantial bail coupled with significant restrictions on Mr. Welden's

---

unfair. Tr. of Initial Hrg., P. 17. There is absolutely no factual support for the government's inference that the family would aid the Defendant in jumping bill, at the risk of losing any funds or real property related to the bond. Inapposite, those close to Mr. Welden agree that he would do nothing that would jeopardize his family or friends, including financial harm. *See* Ex. 1-16, Aff. of Supporters.

[19] Note, however, that "[t]he success rate on pretrial services supervision nationally in 2008 was 87.8 percent (2.6 percent FTA/abscond, 3.2 percent alleged new criminal activity, and 6.4 percent technical violation)." Timothy P. Cadigan, Federal Probation, *The Eastern District of Michigan: How Does It Consistently Achieve High Release Rates?*, 76 Federal Probation 2.

freedom, will reasonably assure the Defendant's presence as required and assure the safety of the community.

Dated: June 7, 2013

Respectfully submitted,

 /s/ Todd Foster
TODD FOSTER
Florida Bar No.: 0325198
tfoster@tfosterlaw.com
CHRISTINA KIMBALL WALKER
Florida Bar No.: 0085093
ckimball@tfosterlaw.com
**TODD FOSTER LAW GROUP**
1881 W. Kennedy Blvd.
Tampa, FL 33606
Phone:      813-229-7373
Facsimile: 813-280-9981

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I filed the foregoing with the Clerk of United States District Court, using the CM/ECF System on this 7th day of June, 2013, which will send electronic notice to **W. Stephen Muldrow, AUSA**.

_/s/ Todd Foster_____
TODD FOSTER